# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

MELCHIZEDEK ROBIN HAYES,

Defendant.

Case No. 21-cr-00069-CJW

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

_____

## TABLE OF CONTENTS

Page

I.     INTRODUCTION.................................................................... 3

II.    FINDINGS OF FACT............................................................. 4

III.   DISCUSSION...................................................................... 11

       A.     The Parties' Positions.............................................. 11

       B.     Whether Contraband Seized From the Bathroom Should be
              Suppressed .......................................................... 13

              1.     Whether Officers Exceeded the Search Conducted by the Richards
                     Without a Proper Reason ................................................ 14

                     a.     Whether Family Members Acted at the Behest of the
                            CRPD............................................................ 14

                     b.     Whether it was Foreseeable that Mr. Richards Sr. Would
                            Enter Defendant's Home Uninvited ........................... 16

1

        *c.*     *Whether CRPD Officers had the Authority to Make a Warrantless Initial Entry into Defendant's Home* ..........**19**

               *i.*     *Apparent Authority* .........................................**19**

               *ii.*    *Exigent Circumstances* ...............................**25**

        *d.*     *Whether Lt. Wibe's Search Exceeded the Scope of the Richards's Private Search* ......................................**28**

               *i.*     *Whether Lt. Wibe's Search that Mirrored the Richards's Search was Constitutional* ...............**30**

               *ii.*    *Whether Seizure of the Contraband from the Bathroom Violated Defendant's Fourth Amendment Rights* ......................................................**33**

     *2.*     *Conclusion* ...............................................................**37**

   *C.*     *Whether Contraband Seized from the Kitchen Should be Suppressed* .................................................................**37**

     *1.*     *Whether the Richards' Plain View Search Justified CRPD's Plain View Search of the Kitchen* ................................................**38**

     *2.*     *Whether Mr. Richards Sr.'s Apparent Authority to Grant the CRPD Access to Defendant's Home Justified CRPD's Plain View Search of the Kitchen* ................................................**39**

     *3.*     *Whether Exigent Circumstances Justified CRPD's Plain View Search of the Kitchen* ................................................**39**

     *4.*     *Conclusion* ...............................................................**40**

*IV.*    *CONCLUSION* ..............................................................**41**

# I.    INTRODUCTION

On October 10, 2021, the Grand Jury charged Defendant Melchizedek Robin Hayes with one count of Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. Sections 922(g)(1), 922(g)(9), 921(a)(3), 921(a)(4), and 924(a)(2), and one count of Possession of a National Firearms Destructive Device Not Registered to Possessor, in violation of 26 U.S.C. Sections 5841, 5861(d), and 5871.  (Doc. 2.)

The matter before the Court is Defendant's Motion to Suppress.  (Doc. 50.)  The Government timely filed a response.  (Doc. 54.)  The Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Thursday, March 31, 2022.  (Doc. 55.)

At the hearing, the following Government exhibits were admitted without objection:

1. Audio of 911 call (Gov. Ex. 1);
2. 2010 Real Estate Sales Contract for the home where Defendant resided  (Gov. Ex. 2);
3. Lt. Dominic Wibe's body camera video (Gov. Ex. 3); and
4. Grand Jury testimony of Michael Richards Sr. (Gov. Ex. 4).

Defendant objected to the admission of Government Exhibits 5 and 6 on the basis of relevancy.  The Government explained that Exhibits 5 and 6, criminal complaints and accompanying records for second degree theft and domestic assault charges, were being offered for the limited purpose of establishing that the officer who responded to the scene of this matter had prior involvement with Defendant and knew who he was. Government Exhibits 5 and 6 were admitted for that limited purpose.

Defendant's Motion to Suppress contained an Inventory of Items to be Suppressed. (Doc. 50 at 1.)  Defendant's exhibits were admitted without objection:

1. Officer Kaczinski's body camera (Def. Ex. A);

3

2.  Officer Asplund's body camera (Def. Ex. B);

3.  Officer Moyle's body camera (Def. Ex. C); and

4.  Lt. Dominic Wibe's body camera (Def. Ex. D).

The Government called one witness, Lt. Dominic Wibe of the Cedar Rapids Police Department. Defendant called one witness, Michael L. Richards. I found both witnesses credible. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.    FINDINGS OF FACT

Beginning in December 2020, Michael L. Richards ("Mr. Richards Sr.") and his wife Lynette ("Ms. Richards") (collectively "Defendant's parents") had concerns about Defendant's declining mental health. (Gov. Ex. 4 at 6.) Mr. Richards Sr. and Ms. Richards are Defendant's parents.[1] (*Id.* at 4.) Defendant had become paranoid, thought people were following him, began missing work, engaged in criminal behavior, and at one point, led police on a high-speed chase as he tried to outrun his perceived pursuers that resulted in him crashing his car. (*Id.* at 5-8.) He eventually lost his job. (*Id.* at 6.) In April 2021, Defendants' parents filed mental health commitment papers regarding

---

[1] In his brief, Defendant refers to Mr. Richards Sr. as his "stepfather." (Doc. 50-1.) Mr. Richards Sr. is not Defendant's biological father, but has been a part of his life since Defendant was just days old and adopted him when he was seven-years-old. (Richards Hr'g Test.) Although this may have been an "adoption" in name only (Def. Ex. D at 2:04:34 p.m. (Mr. Richards Jr: "My father's not related to [Defendant]. He adopted him. Not legally, but, you know. . . .")), Mr. Richards Sr. has considered himself Defendant's father since the day Defendant was born. (Richards Hr'g Test.) Most people referred to Mr. Richards Sr. as Defendant's father during the hearing and on body camera videos. I also do so in this Report and Recommendation.

Hearing testimony is from the Court Reporter's rough draft of the transcript of the March 31, 2022 suppression hearing that was provided as a courtesy to the Court. An official transcript of the hearing had not been entered into the docket at the time this Report and Recommendation was filed.

Defendant because he expressed suicidal intent since his career was gone, his car was gone, and "his life was in shambles." (*Id.* at 7-8.) However, Defendant was released from one mental health facility after a few days and walked away from another one before he ever received treatment. (*Id.* at 9-10.) On May 18 and 19, 2021, Defendant stated that he had made his peace with God and "basically it was, 'I may as well just blow myself up.'" (*Id.* at 8.)

On May 19, 2021, Mr. Richards Sr. noticed that the door to Defendant's house was open, which was unusual. Mr. Richards Sr. knew Defendant was not at home because he saw him leave with Ms. Richards to go to the driver's license station. (Richards Hr'g Test.) Defendant lives directly across the street from his parents on the southeast side of Cedar Rapids and usually keeps his house locked because he has expensive computer and electronic music equipment. (*Id.* at 8-9.) This concerned Mr. Richards Sr. because of Defendant's recent suicide threats. Mr. Richards Sr. does not have a key to Defendant's house, but entered the house through the open door to conduct "what's commonly referred to as a welfare check." (*Id.* at 9.) Michael A. Richards ("Mr. Richards Jr."),[2] Defendant's brother, entered Defendant's house with Mr. Richards Sr. (Richards Hr'g Test.) They found Molotov cocktails under the sink in Defendant's bathroom. (Def. Ex. D at 1:43:37 p.m.)

Mr. Richards Sr. called 911 and explained that his son, the occupant of the home and Defendant in this case, was committed by a judge due to mental health issues for

---

[2] Mr. Richards Sr. testified that his middle initial is "L" and his son's middle initial is "A," which technically does not make Michael A. Richards a "junior" because all parts of a name must match, including the middle name for someone to be a "junior." Kimberly Powell, ThoughtCo., *The Difference Between the Suffixes "Jr." or "II,"* https://www.thoughtco.com/jr-or-ii-suffix-3972347#:~:text=The%20Junior%20must%20be%20a,same%2C%20including%20the%20middle%20name (last visited Apr. 5, 2022). However, during the hearing, Lt. Wibe and I both referred to Michael A. Richards as Mr. Richards Jr. and officers on body camera videos also refer to him as "junior." For clarity and consistency, Michael A. Richards will be referred to as Mr. Richards Jr.

being a danger to himself and others, was released after five days, had "deteriorated seriously," and now had all the materials—gasoline, bottles, and rags—for making Molotov cocktails and was "getting ready to take action." (Gov. Ex. 1 at :30-:59.) Mr. Richards Sr. said he was in the house because his family owned the house and that Defendant was currently walking home from the Department of Transportation on the southwest side of town. (*Id.*)

When officers arrived on the scene, they encountered Mr. Richards Sr. who appeared to lead them directly into the home. I note that there appears to be little or no discussion about the authority Mr. Richards Sr. might have to enter the home before they follow him in. At the very beginning of Lt. Wibe's body camera video, Mr. Richards Sr. can be heard (with some difficulty) stating, "Our family lives across the road." (Gov. Ex. 3 at 1:43:10.) Lt. Dominic Wibe of the Cedar Rapids Police Department ("CRPD") was the first officer to enter the house with Mr. Richards Sr. CRPD Officer Kaczinksi arrived separately and entered the house at about the same time. At 1:43:28 p.m., Mr. Richards Sr. entered the house before Lt. Wibe and led the officers into the house. (Def. Ex. D at 1:43:28 p.m.) Once inside the house, Mr. Richards Sr. stopped in the living room where Mr. Richards Jr. was waiting. The following conversation took place beginning at 1:43:35 p.m.

| | |
|---|---|
| Mr. Richards Sr.: | So, his exact words are, "I've made peace with God. I'm taking myself out and everyone around me." |
| Mr. Richards Jr: | And he's previously threatened to kill all the family. He's making Molotov cocktails in there. You can see for yourself. [Points toward bathroom.] |
| Lt. Wibe: | Okay. |
| Mr. Richards Sr.: | Right there. [Points toward bathroom.] There's a full gallon of gas and bottles and knives and things— |

[Lt. Wibe's Body camera shows Lt. Wibe moving toward the bathroom door.]

6

| Officer Kaczinski: | Do you know, would he have a phone or anything like that? |
|---|---|
| | |
| Mr. Richards Sr.: | [Inaudible response.] |

[At 1:43:57 p.m., Lt. Wibe appears to take a step toward what he later described at the hearing as "a secondary hallway;" but does not go through the open doorway of the bathroom; get close to the gasoline, bottles, or rags; and makes no attempt to touch or disrupt the items. He takes photographs of the contraband with his cell phone beginning at 1:44:27 p.m. During this time, Mr. Richards Sr. speaks to Officer Kaczinski, but the conversation is covered up by conversations on Lt. Wibe's police radio. Lt. Wibe exits the area at 1:44:34 p.m. and sends the photos from his phone. Lt. Wibe smelled gasoline. (Wibe Hr'g Test.) Lt. Wibe testified that he was standing in the doorway when he photographed the items and sent the photos to the Hazardous Device Unit ("HDU").][3]

. . . .

| Lt. Wibe: | So how do we have access to this place? |
|---|---|
| Officer Kaczinski: | That's what I was trying to clarify before we walked in— |
| Mr. Richards Sr.: | You can look it up on the Secretary of State. Our family business is Prometheus Incorporated and we hold real estate . . . .[4] |

_____

[3] Lt. Wibe testified that although gasoline fumes in an enclosed location can be dangerous, he felt that the small amount of fuel he saw in the bathroom, although flammable, was not concerning if everyone stayed in the living room. Lt Wibe testified that "there was a hallway, like a secondary hallway" between the living room and the bathroom, which meant that people in the living room were at a safe enough distance that they would not "ignite anything." Lt. Wibe had been a battalion and brigade commander in the Army Reserve who managed units tasked with safe vehicle fueling operations, among other responsibilities. (Wibe Hr'g Test.)

[4] Mr. Richards Sr. continued to explain how the ownership of the house worked to Officer Kaczinski. However, Officer Kaczinski's body camera was not recording at this time. Mr. Richards Sr. testified that Prometheus Corporation is an Iowa Corporation established by his two oldest sons, Michael Richards Jr. and Benjamin M. Richards, and is the entity that paid off the individual who financed the 2010 purchase of a "cluster" of homes owned and occupied by different family members since shortly after the flood of 2008. [I note that this flood did substantial damage to the area of Cedar Rapids in which Defendant's home sits.] It appears that Defendant had a formal interest in the property based on a purchase agreement. (Gov. Ex. 2.) On the other hand, it appears that Defendant's family members and/or their closely held company

7

(Def. Ex. D at 1:45:00-14 p.m.)

[As Mr. Richards Sr. was explaining the above, Lt. Wibe took a phone call and explained that he was at a residence and had 12 Corona bottles filled with gasoline, 3 or 4 of which had wicks. (*Id.* at 1:45:20-25 p.m.) The HDU officer said that he would come to the house. When Lt. Wibe finished his phone conversation, he continued the conversation with Mr. Richards Sr.:]

| | |
|---|---|
| Officer Kaczinski: | We just have gotta make sure that we're in here legally— |
| | .   .   . |
| Lt. Wibe: | So do you rent this to him, then, or? |
| Mr. Richards Sr.: | Right now he's unemployed— |
| Lt. Wibe: | Yeah. |
| Mr. Richards Sr.: | *So we're letting him stay here.* |
| Lt. Wibe: | So, you're allowing him to stay here, but it's your lease property— |
| Mr. Richards Sr.: | *Yeah, we own the property.* |
| Lt. Wibe: | So you came in for a [sic] inspection or— |
| Mr. Richards Sr.: | Yes— |

---

retained some interest in the property. Moreover, Mr. Richards Sr. commented to officers that "we own the property" and "we're letting [Defendant] stay here," perhaps because of the family relationship even though Defendant was unemployed and unable to make whatever payments were required. Mr. Richards Sr. testified that "the family did the same thing with [Defendant's] house as we did with other family residences, but each family residence was distinct and only that family member lives in each 1, but the commonality was that Prometheus entered in as the deed holder or financier." Gov. Ex. 2 shows that Mr. Richards Sr., Ms. Richards, and Defendant were all listed as the original purchasers of Defendant's home in 2010. (Gov. Ex. 2 at 8.) Mr. Richards Sr. testified, however, that he signed a quit-claim deed after he had a stroke about six years ago giving up all his interest in the property. Mr. Richards Sr. also stated that to his knowledge, he also executed a quit claim deed for his interest in Prometheus around the time of his stroke, resulting in Prometheus being owned by his two oldest sons. The point of this exercise is not to determine who has title to the proverbial Blackacre or even to determine if Mr. Richards Sr. was actually within his rights to enter the residence. This recitation of the legal arrangements surrounding interests in the property demonstrates the arrangements between Defendant and his family were more complex than a run-of-the-mill landlord/tenant relationship or a mortgagor/mortgagee relationship.

| | |
|---|---|
| Mr. Richards Jr.: | No.  He mentioned that he was gonna burn down this house and their house [pointing toward Mr. Richards Sr.] and kill as many family members as he can.  And that's why we came in here.  And we, we just found the Molotov cocktails— |
| Mr. Richards Sr.: | And the door was unlocked—But, uh— |
| Lt. Wibe: | Okay.  So you were doing a safety inspection. |
| Mr. Richards Jr.: | Yeah. |
| Mr. Richards Sr.: | Absolutely. |
| Lt. Wibe: | We just have to clarify that.  After he's threatened to burn it down, you knew he was gone, you did a safety inspection— |
| Officer Kaczinski: | Have you been throughout the whole house? |
| Mr. Richards Sr.: | No. No. No. We went as far as—He told me he had gasoline and materials, so—[5] |
| Lt. Wibe: | Okay. |

(Def. Ex. D at 1:45:25-1:46:25 p.m.) (emphasis added.)

At this point, 1:46:27 p.m., Lt. Wibe left the house to make a phone call and take photographs of the exterior of the house.  Lt. Wibe went back into the house at 1:50:23 p.m. and conducted a plain view search of Defendant's office from the doorway to the office, which is between the entrance to the house and the bathroom. (Def. Ex. D at 1:50:51-1:51:05.) He also tried to confirm with someone on his radio that Defendant had an open committal and the person he spoke with believed Defendant did.  (*Id*. at 1:51:37-1:52:08 p.m.)  While speaking on the radio, Lt. Wibe conducted a plain view search both of the secondary hallway outside of the bathroom and inside the bathroom.  (*Id*. at 1:51:36-1:51:50 p.m.)

---

[5] Although Mr. Richards Sr. later testified that he only went as far as the living room and saw the Molotov cocktails in the bathroom from there, this language from Lt. Wibe's body camera video indicates that, except for being clear that Mr. Richards did not enter the bathroom, his precise location when he viewed the contraband was a bit unclear.

Two HDU fire officers arrived at approximately 1:54 p.m. and Lt. Wibe met them outside the house and explained that Defendant threatened to burn down the house and the "landlord's" house across the street, which is Mr. Richards Sr.'s house, and that Mr. Richards Sr. and Mr. Richards Jr. (collectively, "the Richards") went into the house to do a welfare check. (*Id*. at 1:54:38-42.) One of the HDU officers stated they were on good legal ground (presumably regarding entering and seizing evidence) with the threats and the incendiary devices and that he "could even make the case for a federal charge here." (*Id*. at 1:55:00-08 p.m.) Lt. Wibe told someone named "Dale" on his radio at 1:55:17 p.m. that the "fire guys" were "positive they wanted to pursue charges for this." Dale responded that they would take Defendant into custody. (*Id*. at 1:55:31 p.m.)

Lt. Wibe then entered the bathroom at 1:55:55 p.m. to photograph the gasoline, bottles, and rags with a camera. One of the HDU officers entered the bathroom at 1:56:18 p.m. to begin processing the evidence for seizure. Defendant was taken into custody at approximately 1:56 p.m. as he was walking on a public sidewalk. (Def. Ex. C at 1:56:30 p.m.) Within minutes, Lt. Wibe was notified that Defendant had been arrested. (Def. Ex. D at 1:59:46 p.m.)

While officers were processing evidence in the bathroom, the Richards explained to officers that Defendant's mental health had deteriorated precipitously in the previous three months, that he lost a good job, became paranoid, and began threatening the family. It appears that Mr. Richards Sr. stayed in Defendant's house approximately 45 minutes. (*Id*. at 2:22:45 p.m. (video showing Mr. Richards Sr. leaving house in background of officers' conversation).)

At 2:23 p.m., Officer Kaczinski found a fourth Molotov cocktail in the kitchen made from a glass olive oil bottle. (Def. Ex. A at 2:23:02 p.m.) This cocktail was also seized. (Doc. 18-2 at 4.) All four devices were determined to be explosive devices by the Bureau of Alcohol, Tobacco, and Firearms. (*Id*.) Officers also found a tray in the

oven that contained nails baked into putty. (Def. Ex. D. at 2:14:56-2:15:35 p.m.) Officer Wibe wondered if the items were "something that would blow up" or "a homemade throwing star or something." (*Id.* at 2:16:57-2:17:02 p.m.) These items were not seized. (Doc. 54-1 at 4.)

Lt. Wibe testified that he believed Mr. Richards Sr. had the authority to allow officers to search the home because he is Defendant's father and, as a father himself, Lt. Wibe would want the authority to allow a search if he was concerned about his child's mental health, the child had made threats, and he had found hazardous devices in his child's home. Lt. Wibe also felt that Mr. Richards Sr. had the authority to allow officers to search the home because his family's company owned the property, and as a property owner who saw an open door and was dealing with someone who said they were going to burn down the building, he thought Mr. Richards Sr. had "exigent circumstances, if you will," to enter the home based on an emergency "without notice on the lease." Lt. Wibe never asked Mr. Richards Sr. if he had Defendant's permission to enter the home or if he had a key to the home. Those two factors led Lt. Wibe to believe he had "more than enough ample authority, because it's his property and his son and he allowed us to come in, invited us in, and showed us the devices." Lt. Wibe also testified that he considered getting a search warrant, but did not feel it was necessary.

Defendant now seeks suppression of "bottles, wicks, liquids, a gas can, nails, and other items that the government regards as 'incendiary devices' that were seized from his residence . . . on or about May 19, 2021, including photographs of seized evidence." (Doc. 50 at 1.) Additional facts will be discussed as necessary.

### III. DISCUSSION

#### A. *The Parties' Positions*

Defendant contends officers conducted a warrantless search and seizure of evidence in the bathroom and other parts of his home. Defendant argues that he

maintained his reasonable expectation of privacy in his home because the initial intrusion into his home was unforeseeable. (Doc. 50-1 at 6-7 (citing *United States v. Paige*, 136 F.3d 1012, 1020 (5th Cir. 1998)).) Defendant further contends there is no applicable exception to the warrant requirement that justified this search and seizure. Specifically, Defendant argues that he did not give consent to search his home and no exigent circumstances or community caretaking exception to the warrant requirement permitted law enforcement to conduct a warrantless search of his home and seizure of evidence in his home. (*Id.* at 7-12.)

The Government responds that officers did not violate Defendant's reasonable expectation of privacy because their search of the bathroom did not exceed the scope of the prior search by Mr. Richards Sr. (Doc. 54-1 at 7 (citing, *inter alia*, *United States v. Jacobsen*, 466 U.S. 109 (1984)).) The Government further argues that once officers were legally where Mr. Richards Sr. had been, they had authority to seize the Molotov cocktails under the plain view doctrine. (*Id.* at 8.) The Government also asserts that the intrusion into Defendant's home by the Richards was legal under both *Jacobson* and *United States v. Miller*, 152 F.3d 813, 816 (8th Cir. 1998), but also would be legal under *Paige*, if *Paige* was binding precedent. (*Id.* at 7-9.) The Government argues that officers expanded plain view search of the rest of the house was legal because it was authorized by Mr. Richards Sr.'s consent, which officers reasonably believed he had authority to provide. (*Id.* at 9.)

The Government contends that Mr. Richards Sr. had the apparent authority to consent to the search of Defendant's house. (*Id.* at 9-13.) The Government also asserts that exigent circumstances authorized officers' limited search for, and seizure of, destructive devices and explosive liquids that posed a danger to the community. (*Id.* at 13-15.)

12

**B. Whether Contraband Seized From the Bathroom Should be Suppressed**

The Fourth Amendment to the United States Constitution provides, in part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Therefore, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks omitted)). Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. U.S. Dist. Ct. E. Dist. Mich., S. Div.*, 407 U.S. 297 (1972) (internal quotation marks omitted)). The Government bears the burden of proving an exception to the warrant requirement justifies a warrantless entry and search of a home. *United States v. Hatcher*, 441 F. Supp. 3d 723, 739 (N.D. Iowa 2020) (citing *United States v. Selberg*, 630 F.2d 1292, 1294 (8th Cir. 1980)).

The parties' arguments regarding the "private search" by Mr. Richards Sr. are grounded in *Jacobsen*, 466 U.S. 109. In *Jacobsen*, FedEx employees opened a package that had been damaged by a forklift to examine its contents pursuant to a company insurance policy. 466 U.S. at 111. The employees removed a tube that held plastic bags containing a white powder. *Id.* The employees notified the DEA, replaced the plastic bags in the tube, and put the tube and packing materials back in the original box. *Id.* A DEA agent removed the plastic bags from the box without a warrant and field tested the powder, which turned out to be cocaine. *Id.* at 111-12.

*Jacobsen* held that a police intrusion that stays within the limits of a private search is not a search for Fourth Amendment purposes. *Id.* at 120-21. The Court reasoned that "[t]he agent's viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment." *Id.* at 119-20 (citing *Coolidge v. New*

13

*Hampshire*, 403 U.S. 443, 487-490 (1971); *Burdeau v. McDowell*, 256 U.S. 465, 475-476 (1921)).  Thus, *Jacobsen* held that although the agent's "assertion of dominion and control over the package and its contents . . . constitute[d] a seizure," the seizure was reasonable because the package "could no longer support any expectation of privacy." *Id.* at 120-21.  *Jacobsen* further held that the agent did not exceed the scope of the original private search by conducting the field test on the powder.  *Id.* at 123-26 ("In sum, the federal agents did not infringe any constitutionally protected privacy interest that had not already been frustrated as the result of private conduct. To the extent that a protected possessory interest was infringed, the infringement was *de minimis* and constitutionally reasonable.")

### 1.    *Whether Officers Exceeded the Search Conducted by the Richards Without a Proper Reason*

#### a.    *Whether Family Members Acted at the Behest of the CRPD*

The facts resulting in seizure of the contraband[6] are largely undisputed. The Richards saw what they believed were Molotov cocktails in Defendant's bathroom.  At that point, the Fourth Amendment was not implicated unless they were acting at the behest of the CRPD or some other governmental entity.

> The Fourth Amendment "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed.2d 85 (1984), *quoting Walter v. United States*, 447 U.S. 649, 662, 100 S. Ct. 2395, 65 L. Ed.2d 410 (1980). Three

---

[6]The "contraband" in question are the components for Molotov cocktails. In their ordinary character gasoline, bottles, and rags may not be contraband. If they were, many garages might be considered suspect. In the context of this case, however, the items in question take on the character of contraband.  The items were gathered in proximity to one another in an unusual place, a residential bathroom.  Moreover, Defendant had made threats to blow himself up, as well as threatening others.  Thus, the reason why they would be considered contraband was apparent.

14

factors determine whether a private individual is acting as, or with the participation of, a government official: "(1) whether the government had knowledge of and acquiesced in the intrusive conduct; (2) whether the citizen intended to assist law enforcement or instead acted to further his own purposes; and (3) whether the citizen acted at the government's request." *United States v. Highbull*, 894 F.3d 988, 992 (8th Cir. 2018) (cleaned up). Avalos "bears the burden of proving by a preponderance of the evidence" that the Creighton University security officers acted as, or participated with, government officials. *Id.*

*United States v. Avalos*, 984 F.3d 1306, 1307–08 (8th Cir. 2021).

Applying the *Highbull* factors to the facts of this case, Mr. Richards Sr. and Mr. Richards Jr, who conducted the original search of Defendant's home and saw the contraband in his bathroom did not act at the behest of, or participate with, the CRPD in any search. The CRPD had no knowledge of the search until they received Mr. Richards Sr.'s 911 call. Mr. Richards Sr. and Mr. Richards Jr. did not intend to assist law enforcement when they searched Defendant's home. They intended to determine if Defendant had taken steps to hurt himself or others. They only called 911 so officers after they discovered the Molotov cocktail materials. Although the 911 call does not show that he did so, Mr. Richards Sr. testified that he asked for a mental health officer to come to the scene, which indicates that he wanted help for his son. During the 911 call, Mr. Richards Sr. stated that although Defendant was under a mental health commitment order for being a threat to himself and others, he was let out after five days. (Gov. Ex. 1 at :29-:43.) Finally, the Richards were not acting at the request of the CRPD. Mr. Richards Sr. testified that his concern for Defendant's mental health was "extremely high," so he entered the home on May 19, 2021 "out of concern for [his] son Mel." Both Mr. Richards Sr. and Mr. Richards Jr. told Lt. Wibe they entered to conduct a safety inspection. Thus, the Richards were not acting at the behest of, or participating with, the CRPD.

### b.  Whether it was Foreseeable that Mr. Richards Sr. Would Enter Defendant's Home Uninvited

"The Fourth Amendment's 'central requirement' is one of reasonableness, which is measured in objective terms by examining the totality of the circumstances." *United States v. Farnell*, 701 F.3d 256, 261 (8th Cir. 2012) (quoting *Illinois v. McArthur*, 531 U.S. 326, 330 (2001); *Ohio v. Robinette*, 519 U.S. 33, 39, (1996)) (internal citations moved to parenthetical).

Defendant argues that officers' entry into his home was a search because he had no reason to foresee his father's entry into his home without Defendant first giving him permission.  (Doc. 50-1 at 7.)  Defendant relies on the Fifth Circuit's holding in *Paige*, 136 F.3d 1012.  Defendant argues that he did not lose his Fourth Amendment right to be free from a warrantless search simply because his father, "without his knowledge or consent," entered his home before the police searched it.  (*Id.* at 5-6.)

> "[T]he proper Fourth Amendment inquiry, when confronted with a police search of a home that extends no further than a previously-conducted private party search, is to determine whether the homeowner or occupant continues to possess a reasonable expectation of privacy after the private search occurs." *United States v. Paige*, 136 F.3d 1012, 1020 (5th Cir. 1998). In the instant case, the defendant did not authorize his stepfather to enter his home. His stepfather did not have a key to the premises. The defendant did not invite his stepfather or anyone else to enter his home. Home residents do not need to lock their doors to have a reasonable expectation of privacy within their residence. *See State v. Smith*, 154 A.3d 660, 667 (N.H. 2017) (noting that even leaving a door open "does not destroy a person's privacy rights").
>
> A home occupant maintains a reasonable expectation of privacy in a home unless the initial intrusion into the home is foreseeable. *Paige*, 136 F.3d at 1020. "If, however, the private party's initial intrusion was not reasonably foreseeable, the occupant's reasonable expectation of privacy will survive, and the subsequent police search *will* indeed activate the Fourth Amendment." *Id*.

(Doc. 50-1 at 6 (emphasis in original).)

Defendant asserts that because it was not foreseeable that his father would enter his home uninvited, his situation can be distinguished from the situation in *United States v. Miller*, 152 F.3d 813 (8th Cir. 1998), cited by the Government. In *Miller*, employees of a drug treatment facility entered a resident's apartment because they smelled cigarette smoke, which was a violation of house rules, saw evidence of illegal drug use in plain view, called law enforcement, whom they admitted to the apartment, and who saw only what the employees had seen before obtaining a search warrant for the apartment. 152 F.3d at 815. *Miller* held that there was "no question" the employees acted in a private capacity when they entered the apartment and that the police intrusion went no further than the employees' intrusion, and therefore "no Fourth Amendment search occurred at all, so the drug evidence in [the] case was lawfully obtained." *Id.* at 816. Judge Murphy concurred in the result and stated that she "would not extend the *Jacobsen* rule beyond circumstances where an intrusion by a private actor into a residence was reasonably foreseeable to the owner or tenant." *Id.* (Murphy, J., concurring.)

I respectfully disagree with Defendant that it was not foreseeable that his father and brother would enter his home without his permission. Mr. Richards Sr. was not a stranger to the property and far from being an officious intermeddler. He is listed on the original purchase documents as a co-purchaser and then had an interest in the home as an owner of Prometheus, the family corporation that paid off the mortgage on the home, something he apparently explained to officers on the scene.[7] Mr. Richards Sr. testified

---

[7] It does not seem that Defendant was aware of the quit claim deed Mr. Richards Sr. testified about because in his brief, Defendant stated that Mr. Richards Sr. "has an ownership interest in a business entity that holds the deed to the defendant's residence." (Doc. 50-1 at 1.) Mr. Richards Jr. is still an owner of Prometheus and thus has an ownership stake in Defendant's home, not that this allowed Mr. Richards Jr. to enter the house without permission. However, like his father, Mr. Richards Jr. also expressed concern for Defendant's mental health and the need to do a safety inspection.

17

that the cluster of houses that was purchased after the 2008 flood, including Defendant's home, was worked on by "the family." Mr. Richards Sr. was also intimately involved in getting Defendant help for his recent mental health problems: he and Ms. Richards filed commitment papers on Defendant because he had become a danger to himself and others. Mr. Richards Sr. was also a target of Defendant's threats to burn down the home that he and Ms. Richards shared. In addition, Mr. Richards Sr. was aware that Defendant's deteriorating mental state not only manifested in threats, but also in actual criminal behavior. Mr. Richards Sr. was interviewed by CRPD in relation to the robbery Defendant was charged with in April 2021 and told the CRPD that Defendant's mental health had been deteriorating for months and that Defendant was not acting like himself. (Gov. Ex. 5 at 10.) He also knew that Defendant's paranoia resulted in an attempt to flee Iowa that ended in a high-speed police chase on the interstate that "completely destroyed [Defendant's] car." (Gov. Ex. 4 at 7.)

Mr. Richards Sr. was aware of how careful Defendant was to lock his home because he has expensive computer and electronic music equipment and was therefore concerned when he saw the open door when he knew Defendant was not home. It was reasonably foreseeable that Mr. Richards Sr., who had raised Defendant since at least the age of seven, would enter the home if he was concerned for his son's safety and the safety of his son's possessions. *Paige* even recognized that when making a foreseeability determination, "consideration must be given to whether the activities of the home's occupants or the circumstances within the home at the time of the private search created a risk of intrusion by the private party that was reasonably foreseeable." 136 F.3d at 1020. *Paige* held that if the private party's intrusion was reasonably foreseeable based on such activities or circumstances, occupants do not possess reasonable expectations of privacy in the area searched and any subsequent search by law enforcement will not violate the Fourth Amendment. *Id.* Here, the circumstances surrounding ownership of

the home; the circumstances related to Defendant's behavior; his worsening mental health; Mr. Richards Sr.'s attendant concerns that resulted in the filing of commitment papers to protect Defendant and others; and Mr. Richards Sr.'s knowledge that Defendant always protected his valuable electronic equipment and therefore, that the open door on May 19 was but one more out-of-character behavior that needed investigating, all made the Richards's entry into Defendant's home foreseeable.[8]

### c. Whether CRPD Officers had the Authority to Make a Warrantless Initial Entry into Defendant's Home

#### i. Apparent Authority

The Fourth Amendment requires the police to obtain a warrant to search an individual's home, unless an established exception to the warrant requirement exists. *United States v. Leverington*, 397 F.3d 1112, 1114 (8th Cir. 2005). Consent is a valid exception to the warrant requirement, *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), and may be given either by the suspect or by some other person who has common authority over, or a sufficient relationship to, the premises to be searched. *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). The government bears the burden of proving that an exception to the warrant requirement exists. *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003); *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990) ("The burden of establishing . . . common authority rests upon the State.").

In determining a third party's authority to consent, the officers must reasonably believe that, given the totality of the circumstances, the third party possesses authority to consent. *Rodriguez*, 497 U.S. at 186, 110 S. Ct. 2793; *United States v. Pennington*, 287 F.3d 739, 746–47 (8th Cir. 2002) (stating that "[t]he critical facts . . . are not the actual relationship

---

[8] Defendant admits that Mr. Richards Sr's entrance into his house was not a constitutional violation: "The defense does not seek suppression of Richards Sr.'s statement to the police on constitutional grounds because Richards Sr.'s initial entry was not a Fourth Amendment search." (Doc. 50-1 at 4.)

19

between the consenter and owner, but how that relationship appears to the officer who asked for consent." (citation and internal quotations omitted)).

*United States v. Weston*, 443 F.3d 661, 667–68 (8th Cir. 2006) (alterations in original); *United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003) (Whether it is reasonable to believe a third party is authorized to give consent depends on whether "the facts available to the officer at the time consent is given [would] warrant a person of reasonable caution in the belief that the consenting party had authority over the item to be searched.").

"[T]he generally accepted theoretical basis for the proposition that someone other than the defendant can consent to a search is that the third party exercises some common authority over the place or item searched." *United States v. Cunningham*, No. 20-CR-104-CJW-MAR, 2021 WL 2593766, at *6 (N.D. Iowa June 24, 2021) (citations omitted). Mere ownership interest in a property, alone, is not enough for one to imply common authority; rather, "joint access or control" such that one assumes the risk that one of the others "might permit the common area to be searched" determines common authority. *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). "[W]hat is generally demanded of the many factual determinations that must regularly be made by . . . the police officer conducting a search or seizure under one of the exceptions to the warrant requirement[] is not they always be correct, but that they always be reasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990).

I find that CRPD officers reasonably relied on the Richards' consent to initially enter Defendant's home and approach the bathroom. As discussed above, Mr. Richards Sr. entered the home before the officers and Lt. Wibe only went as far as the bathroom doorway, photographed the contraband, and called HDU while he and Officer Kaczinski confirmed their authority for accessing the home. Up until that point, these facts are analogous to the facts of *Miller*. 152 F.3d at 815. It was reasonable for officers to believe Mr. Richards Sr. had authority to grant them access to the home for all the reasons

just discussed above in part III.B.b, *supra*. Lt. Wibe testified that he thought Mr. Richards Sr. had authority to let them into the home because he was a concerned father whose son was having a mental health crisis, was creating explosive devices, and was threatening to kill the family. He stated that if he was in that position, he would want the authority to "intercede and support [his] son." (Wibe Hr'g Test.) Lt. Wibe testified to the following:

| | |
|---|---|
| The Court: | Okay. And just so it's clear to me, what information did you have about the situation before you went into the residence? I know there's a 911 call. Had you listened to the 911 call, or did you just receive some information about it? |
| Mr. Richards Sr.: | Sir, we received information over the radio, and then the call notes had the initial block of statements the dispatchers typed in, and that said that Mr. Hayes was en route to his house, they had a committal on him, and they had bomb making material that he had made in the house and gasoline inside the house. So those events I knew, that the father was there with bomb making material that had been made by the son, and they had an open committal for mental health, and they wanted us to come and ensure the safety of the residence and the family. |

Lt. Wibe also saw the open door and knew Defendant said he wanted to burn down the home, he felt Mr. Richards Sr. also had authority to enter the home without notice because there was an emergency, "an exigent circumstance, if you will," and then had the authority to invite law enforcement into the home and show them the Molotov cocktails he found. (*Id.*)

These facts distinguish Mr. Richards Sr. from a typical landlord who, as Defendant correctly points out, usually cannot give permission for law enforcement to enter a rental home. *See United States v. Williams*, 523 F.2d 64, 66 (8th Cir. 1975) (citing *Chapman v. United States*, 365 U.S. 610 (1961)). The categorical legal

21

relationship between parties (for example, landlord/tenant or parent/child) is not by itself determinative in assessing the reasonableness of an officer's belief in the authority to give consent. An officer who merely called an out-of-state landlord or parent to obtain authority to a search residence, would likely not have a reasonable belief that person was authorized to consent to the search. But, as the facts of this case show, these relationships – especially relationships between parents and their children – come in many varieties. Some parents live with their adult children. Some parents are granted express permission to enter their children's homes to care for toddlers, pets, or houseplants. On the other hand, some parents may have been expressly denied permission to enter their child's home. A police officer is not required obtain a detailed family history to assess a family member's authority to grant permission to enter any more than he is required to review a lease before accepting a tenant's invitation to enter. Assessing the reasonableness of accepting a family member's authority is made difficult by the wide variety in these relationships. It is also made difficult by the informality and assumptions these relationships are often founded upon. Perhaps some family members formally grant each other access to each other dwellings to check on them in emergencies. It seems more likely, however, that family members draw on their own notions of necessity as well as familial, geographic, and emotional proximity to determine their own authorization. For example, I expect many people would feel "authorized" to enter an older parent's home a few blocks away to check on him or her if phone calls went unanswered, or newspapers piled up on the doorstep. These same people might hesitate to walk uninvited into a cousin's home three states away, just to say hello. Ultimately, I conclude that a relationship between a father and an adult child is the type that *could* reasonably considered in assessing the authority to enter. To be sure, that relationship alone is insufficient to create apparent (much less actual) authority for a search. Here, however,

the important question is what else supported law enforcement's belief the Richards had authority to authorize entry.

At the hearing, Defendant argued that the police did not question Mr. Richards Sr. about his authority to enter Defendant's home until they were inside the home and after Lt. Wibe had photographed the contraband under the sink in the bathroom. Thus, I assume Defendant argues that Lt. Wibe and Officer Kaczinski entered Defendant's home without any indication that Mr. Richards Sr. had the authority to grant them access. Defendant referred the Court to Government's Exhibit 3, which shows the officers entering the home with Mr. Richards Sr. Near the beginning of the body camera video, Mr. Richards Sr. says his family lives across the street. (Gov. Ex. 3 at 1:43:10.) Officer Kaczinski answers, "Okay." (*Id.* at 1:43:13.)[9] Defendant is correct that there is no clear indication on Lt. Wibe's body camera video that Mr. Richards Sr. has the authority to grant officers access to enter the home.

However, the officers were not going in without any information about the situation. In his 911 call, Mr. Richards Sr. stated that his son had been committed for mental health treatment for "threatening himself and others," was released five days later, that his mental health had "deteriorated seriously" since that time, that Mr. Richards Sr. was in "his home" "because our family owns the home," that all the materials for Molotov cocktails were in the home, and that his son was "getting ready to take action." (Gov. Ex. 1 at :30-:59.) From the video evidence, it appears that Mr. Richards Sr. met the officers outside the home, which indicated a sense of urgency, and Mr. Richards Sr.

---

[9] Lt. Wibe testified that when he arrived, Mr. Richards Sr. was outside, walked officers towards the house, "and explained that they had found these devices in the residence, and were concerned their son, Melchizedek, had threatened to burn down his house, and the family house across the street, and kill as many people as he could." (Wibe Hr'g Test.) However, none of that can be heard on Lt. Wibe's body camera video. Officer Kaczinski's body camera was not recording at the time. Lt. Wibe's body camera video confirms that Mr. Richard Sr. explained the above situation to officers once they were in Defendant's home.

entered the home without any hesitation. The 911 call did not disclose Defendant's age, other than indicating that he had gone to the driver's license station. Although Mr. Richards Sr. referenced "his home" in the 911 call, it was not apparent that Defendant was an adult residing separately from his father when Lt. Wibe was led into the residence. In addition, while Lt. Wibe did not author either police report in evidence (Gov. Exs. 5, 6), he testified to the following:

> Q.    Had you ever had any prior contact, either you or other
>        officers that work for you, with Mr. Hayes?
> A.    Yes. We had several incidents in the few weeks before this.

Given the facts available on May 19, 2021, it was reasonable for officers to conclude that the relationship between Mr. Richards Sr. and Defendant on that day was one that allowed Mr. Richards Sr. to enter Defendant's home when Defendant was not home and to allow law enforcement to enter the home when Defendant was experiencing a mental health crisis and had threatened to "take himself out and everyone around him." *See United States v. Pennington*, 287 F.3d 739, 746–47 (8th Cir. 2002) (holding that "[t]he critical facts" are how that relationship between the consenter and the defendant "appear[] to the officer who asked for consent"). To be clear, this finding is narrow and is based on the totality of the circumstances that officers faced on May 19, 2021. *See Weston*, 443 F.3d at 668 (quotation omitted). This is not to say that Mr. Richards Sr.— or any father—would always have the apparent authority to enter his son's home uninvited and to allow law enforcement to enter. For example, it might have been unreasonable for Mr. Richards Sr. to enter Defendant's home uninvited if he suspected Defendant had bag of cocaine in the house. However, the facts facing Mr. Richards made it reasonable for him to suspect Defendant had something more dangerous in the house, something that could harm not only Defendant, but also "everyone around [him.]" (Def. Ex. D at 1:43:43 p.m.)

24

## ii. Exigent Circumstances

I also find that exigent circumstances authorized limited entry into the home. "Exigency is a recognized exception to the warrant requirement." *Hatcher*, 441 F. Supp. 3d. at 739 (citing *Kleinholz v. United States*, 339 F.3d 674, 676 (8th Cir. 2003)). "The exigent circumstances exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Ramirez*, 676 F.3d 755, 759 (8th Cir. 2012) (alteration omitted) (quoting *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996)). Although, "exigency may be substituted for a warrant, . . . probable cause must be present before either a warrant or exigency will allow a search." *Kleinholz*, 339 F.3d at 676.

"The question . . . is not whether there were actual probable cause and exigent circumstances, but whether the officers could reasonably have thought so." *Greiner v. City of Champlin*, 27 F.3d 1346, 1353 (8th Cir. 1994) (citation omitted). Courts consider "the circumstances that confronted police at the time of the entry" to determine whether the warrantless entry was justified. *United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *Kleinholz*, 339 F.3d at 676 (quoting *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000)). Common sense drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "'[T]his practical and common-sensical standard' is based on 'the totality of the circumstances.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)). However, "[e]xigency does not inherently exist . . . merely because there is probable cause to believe that a serious crime has been committed." *Hatcher*, 441 F.

Supp. 3d at 739 (citing *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984); *United States v. Neadeau*, No. 17-CR-173 (SRN/LIB), 2018 WL 301192, at *9 (D. Minn. Jan. 5, 2018)).

Here, I first find that probable cause existed because there was a fair probability that the components of Molotov cocktails (which could be both contraband and evidence of a crime) would be found in Defendant's home based on Mr. Richards Sr.'s 911 call explaining that his son, who had been committed for being a danger to himself and others and released after only five days, had these materials in the home. The CRPD also had two recent contacts with Defendant: on April 27, 2021, the CRPD filed theft charges against Defendant and on May 10, 2021 the CRPD filed domestic assault charges against Defendant. (Gov. Exs. 5, 6.) At the time of the theft charge, the police report noted that Mr. Richards Sr. informed officers that Defendant "had been in a deteriorating mental state for the past few months and it had really escalated in the past few days where he was not acting like himself." (Gov. Ex. 5 at 10.) All these facts were known to the CRPD and created a fair probability that the materials to create Molotov cocktails would be found in Defendant's home. *Kleinholz*, 339 F.3d at 676.

I also find that exigent circumstances allowed officers to make their initial warrantless entry into the home. Without entering the home, officers would have no idea how serious the situation was, beyond the likely presence of the flammable components witnessed by Mr. Richards Sr. Defendant had a documented recent history of mental health deterioration accompanied by criminal behavior. (Gov. Exs. 1, 5, 6.) Mr. Richards Sr. used the words "ready to take action" in his 911 call and Lt. Wibe knew the dangers gasoline fumes could present when confined in small spaces. The only way to assess and eliminate any danger to the home and the surrounding property was to make a limited entry into the home. *See id.* at 676-77. After receiving an anonymous tip about a methamphetamine lab in the front bedroom of the defendant's home, police officers in *Kleinholz* approached the house and smelled ether, a substance used in the manufacture

26

of methamphetamine, which the Eighth Circuit opined, alone, might have supported probable cause. *Id.* at 677. In addition, the well-documented volatile nature of methamphetamine labs justified an "immediate but limited search" of the house. *Id.*; *see also United States v. Boettger*, 71 F.3d 1410, 1416-17 (8th Cir. 1995) (repeated warrantless entries into explosion site to assess danger and possibility of mitigation justified as danger to public still existed because explosive devices and chemicals still remained until expert could remove them). After confirming the presence of a lab, officers in *Kleinholz* were justified in re-entering to reduce the immediate risks of fire and explosion caused by such a lab by turning off heat sources. *Id.* at 676-77.

A similar situation faced officers in this case as faced officers in *Kleinholz*. CRPD was alerted to the presence of possible contraband by a citizen just as officers were alerted to the presence of the methamphetamine lab by a citizen in *Kleinholz*. Although Lt. Wibe eventually concluded that the amount of gasoline in the bathroom was not dangerous as long as people remained in the living room, he knew that gasoline fumes are dangerous in enclosed areas, but did not know how much gasoline was involved in this incident until he entered the home and assessed the situation. That assessment justified an "immediate but limited search" of Defendant's home. *Id.* at 677; *See also United States v. Francis*, 327 F.3d 729, 736 (8th Cir. 2003) (noting that in *United States v. Antwine*, 873 F.2d 144, 1147 (8th Cir. 1989), "we affirmed 'our long-held view that legitimate concern for the safety of individuals may constitute "exigent circumstances" justifying warrantless entries and searches.'").

In addition, Defendant was not unknown to the CRPD. Lt. Wibe testified that the CRPD had had "several incidents" involving Defendant in the weeks prior to May 19, 2021. (Wibe Hr'g Test.; Gov. Ex. 5 (Apr. 27, 2021 second degree theft complaint); Gov. Ex. 6 (May 10, 2021 domestic abuse assault complaint).) Moreover, although officers knew Defendant was not at home at that moment, they did not know when he

would return home and potentially escalate the situation. Mr. Richards Sr. stated that his son was carrying a bag and he did not know if that bag contained an explosive. (Def. Ex. D at 1:44:44-54 p.m.) Officers had no reason to doubt Mr. Richards Sr. and therefore reasonably believed there were Molotov cocktails in the home that could not only pose a threat to lives, but also could destroy evidence of the very crime they were investigating. There was also the very real possibility that Defendant could come home and access explosive materials. Moreover, even if the officers were confident Defendant was not present and his arrival was not imminent, they need not assume that the reported Molotov cocktails were the only threat or that Defendant was the only possible source of ignition. Accordingly, Lt. Wibe and Officer Kaczinski could reasonably have felt exigent circumstances warranted entry into Defendant's home on May 19, 2021. *See Greiner*, 27 F.3d at 1353.

### d. Whether Lt. Wibe's Search Exceeded the Scope of the Richards's Private Search

Defendant argues that Lt. Wibe exceeded the parameters of the search conducted by the Richards because "the decision for police to search and to seize bottles from the bathroom was made by law enforcement. Those officers, not a private citizen, conducted the seizure at issue in this case. This was not a 'private citizen' search. It was a search by law enforcement officers." (Doc. 50-1 at 5.) Defendant asserts that once Lt. Wibe saw the Molotov cocktails in the bathroom, he should have sought a warrant. Defendant distinguishes this case from *Jacobsen* because in *Jacobsen*, the FedEx employees opened and examined the contents of the package before turning it over to law enforcement and here, Mr. Richards Sr. "did not deliver the purported Molotov cocktails to the police. He left them in place in the defendant's residence." (*Id.* at 4-5.)

*United States v. Va Lerie*, 424 F.3d 694 (8th Cir. 2005) (en banc) is helpful in explaining the important difference between a search and a seizure.

28

Not surprisingly, the Supreme Court has recognized the Search Clause is wholly distinct from the Seizure Clause, such that courts applying these clauses must understand they provide different protections against government conduct. *See Segura v. United States*, 468 U.S. 796, 806, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984) ("Different interests are implicated by a seizure than by a search."). According to the Supreme Court, a Fourth Amendment search "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). On the other hand, a Fourth Amendment seizure of property "occurs when there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113, 104 S. Ct. 1652. While the Search Clause protects an individual's expectation of privacy, the Supreme Court has indicated the Seizure Clause relates, in part, to freedom of movement: "While the concept of a 'seizure' of property is not much discussed in our cases, this definition follows from our oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth Amendment- meaningful interference, however brief, with an individual's freedom of movement." *Id.* at 113 n. 5, 104 S. Ct. 1652; see also *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989) ("The initial detention necessary to procure [ ] evidence may be a seizure of the person if the detention amounts to a meaningful interference with his freedom of movement. Obtaining and examining the evidence may also be a search if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable.") (citations omitted). The Court also has stated "not every governmental interference with an individual's freedom of movement raises such constitutional concerns that there is a seizure of the person." *Skinner,* 489 U.S. at 618, 109 S. Ct. 1402. It necessarily follows that not every governmental interference with a person's property constitutes a seizure of that property under the Constitution.

*Va Lerie*, 424 F.3d at 701 (alterations in original).

In the instant case, officers were called after the Richards had conducted a private search of Defendant's home as far as the doorway of the bathroom from where they could see the gas can, bottles, fabric wicks, and what appeared to be some completed Molotov

cocktails.[10]  Mr. Richards Sr. then called 911.  The first question is whether that search was valid.

> ### i.     Whether Lt. Wibe's Search that Mirrored the Richards's Search was Constitutional

*United States v. Rouse*, 148 F.3d 1040  (8th Cir. 1998) is helpful in understanding the limits of a governmental search after a private search.  In *Rouse*, an airline employee had been advised by employees from a plane's departure city to be on the alert for two bags to arrive on the plane.  148 F.3d at 1041.  Although there was some indication the employee may have been looking for identification to return the bags, she also may have been looking for drugs or money, and her ultimate motive for searching the bags is unclear.  *Id.*  Whatever her motivation, she searched the bags and found a number of identification cards and blank social security cards.  *Id.*   The employee called law enforcement who searched the bags and discovered not only the items the employee found, but also a laminating machine and material for laminating cards.  *Id.*   The defendant was indicted on two counts of possessing a counterfeit social security card with intent to alter it, and one count of counterfeiting a social security card.  *Id.* at 1040.  *Rouse* declined to suppress the identification and social security cards because law enforcement had "already been informed by airline officials that the bags contained multiple identification cards and blank social security cards."  *Id.* at 1041 (citing *Jacobsen*

---

[10] Mr. Richards Sr. testified as follows:
  Q. When you walked into the residence -- when you walked into the residence, how far did you go in before you saw the Molotov cocktails?
  A. It would take about 3 steps. It's a small home, and the bathroom door was wide open, and I saw beer bottles with liquid in them.
  Q. There was also a gas can there as well?
  A. I did see a gas can there, yes.
  Q. Did you venture any closer to those devices, or did you stay in the living room?
  A. I remember staying in the living room. It's such a small house, there was no need to go in any further.

generally).  However, *Rouse* suppressed the laminating machine and materials.  *Id.*  The
Eighth Circuit reasoned,

> [t]hese were not items with respect to which the officers had had any
> previous information, and they were therefore not objects with respect to
> which Mr. Rouse had already had his expectations of privacy frustrated.
> There is no evidence that these items were in plain view when the officers
> arrived or that [the employee] had discovered them prior to that time.

*Id.*; *see also United States v. Runyan*, 275 F.3d 449, 461, 467-68 (5th Cir. 2001) (law
enforcement search exceeded private search when ex-wife found child pornography on
computer and some computer disks, turned  computer and several disks over to law
enforcement, and law enforcement viewed more disks than ex-wife viewed before
obtaining search warrants for the computer and all the disks; however case remanded for
trial court to consider independent source doctrine), *evidence held admissible as product
of independent source*, 290 F.3d 223 (5th Cir. 2002); *United States v. Bowman*, 215 F.3d
951, 956, 963 (9th Cir. 2000) (law enforcement search exceeded private search when
search by owner of storage locker revealed silencer parts, a bulletproof vest, a police
scanner, a book of disguises, a baseball cap, and some videotapes, and an ATF agent
viewed the video tapes and dusted contents for prints, which the owner did not do);[11]
*United States v. Kinney*, 953 F.2d 863, 866 (4th Cir. 1992) (holding there was no
"analytically significant reason to view the recording of gun serial numbers in the present
case any differently from the drug field tests in *Jacobsen*" when officers took guns merely
seen by private citizen out of locked closet and bags to read serial numbers on guns).  *But
see United States v. Guindi*, 554 F. Supp. 2d 1018, 1023-25 (N.D. Cal. 2008) (gathering
cases and distinguishing the case from *Rouse*); *United States v. Gricco*, No. CR.A. 01-

---

[11] Although this evidence exceeded the private search, content of video tapes was harmless error
because content was not used in prosecution and although the fingerprints were used in a
subsequent warrant application, there was sufficient untainted information in the affidavit to
support probable cause.  *Bowman*, 215 F.3d at 963.

90, 2002 WL 393115, at *11 (E.D. Pa. Mar. 12, 2002) (adopting "*Runyun* rule"[12] that police may examine more items in closed containers than private citizens examined because doing otherwise would "over-deter the police, preventing them from engaging in lawful investigation of containers where any reasonable expectation of privacy has already been eroded.") (quotation omitted; distinguishing *Rouse*, 148 F.3d at 1041).

Thus, the question is whether Lt. Wibe's search exceeded the private search conducted by the Richards by accessing evidence that the Richards did not tell him about or that was not visible from the point the Richards reached in their search. *See Runyan*, 275 F.3d at 461 (evidence on certain disks not known to law enforcement before they conducted their own search); *Bowman*, 215 F.3d at 963 (evidence contained on video tapes and revealed by finger prints not known to law enforcement before they conducted their own search); *Rouse*, 148 F.3d at 1041 (laminating machine and materials were not known to law enforcement before they conducted their own search). The answer is "no." Lt. Wibe's search of the bathroom went no farther than the search conducted by the Richards. He traced the "search path" taken by Mr. Richards Sr. and Mr. Richards Jr. and did not enter the bathroom when he took his first set of photographs from the doorway of the bathroom on his phone. Therefore, even if the contraband had not been in plain view, Defendant's expectation of privacy in it was already compromised by the Richards's private search. *Rouse*, 148 F.3d at 1041. Lt. Wibe never touched the contraband in the bathroom, leaving that for the HDU team, after discussion with them regarding the legal authority to enter Defendant's home, the second time Lt. Wibe engaged in such discussions during this incident. As will be discussed below, by the time the HDU team arrived to seize the items, their illegal nature was apparent and seizure

---

[12] *Runyun* also held that the police were allowed to view more files on the disks the defendant's ex-wife viewed, "reject[ing] the reasoning in *Rouse*" and allowing law enforcement to conduct a thorough search of closed containers, even though the private search of containers was limited. 275 F.3d at 464-65.

was allowed under the plain view doctrine.  Thus, I find that Lt. Wibe's search did not exceed the scope of the private search conducted by the Richards and was valid under both *Jacobsen* and *Rouse*.

ii.       **Whether Seizure of the Contraband from the Bathroom Violated Defendant's Fourth Amendment Rights**

The parties do not dispute that officers exceeded the scope of the Richards's search when they seized the contraband the Richards found under the bathroom sink. However, Defendant argues that because he had no reason to foresee Mr. Richards Sr.'s initial entry into his home, "the subsequent entry by police officers was a Fourth Amendment search. The warrantless entry and seizure of evidence was in violation of the Fourth Amendment, and must be suppressed." (Doc. 50-1 at 7.)

"A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113; *United States v. Demoss*, 279 F.3d 632, 635 (8th Cir. 2002). Warrantless seizures are per se unreasonable unless one of the carefully drawn exceptions applies. *See Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993); *United States v. Lewis*, 864 F.3d 937, 943 (8th Cir. 2017).  Again, *Va Lerie* is instructive:

> After announcing a seizure of property "occurs when there is some meaningful interference with an individual's possessory interests in that property," the Court concluded in *Jacobsen* that law enforcement's exertion of dominion and control over private property for its own purposes constituted a seizure in that case. Thus, the facts of *Jacobsen* shed some light on how to apply the Supreme Court's seizure standard. . . . The field tests revealed the white substance was cocaine. Other DEA agents also field tested the white substance. When determining whether the agents unlawfully seized and searched the package, the Court concluded the DEA "agents' assertion of dominion and control over the package and its contents did constitute a 'seizure.' " *Id.* at 120, 104 S. Ct. 1652. After recognizing "the Magistrate and the District Court found that the agents took custody of the package from Federal Express after they arrived" even though the

33

package's owners "had entrusted possession of the items to Federal Express," the Court held "the decision by governmental authorities to exert dominion and control over the package for their own purposes clearly constituted a 'seizure.'" *Id.* n. 18, 104 S. Ct. 1652. Notwithstanding the Court's seizure decision, the Court concluded the seizure was not unreasonable because the agents had probable cause to believe the package contained contraband. *Id.* at 121–22, 104 S. Ct. 1652.

We do not believe the Court meant to express two different standards-i.e., meaningful interference with a person's possessory interests and dominion and control-when instructing courts how to apply Fourth Amendment seizure principles. Instead, we believe the Court referenced dominion and control when applying the seizure standard. That is, we believe the Court concluded law enforcement's exertion of dominion and control over the package for its own purposes-and in contravention to Federal Express's custody of the package-constituted a seizure under the Fourth Amendment because it constituted some meaningful interference with a person's possessory interests. Thus, the seizure standard prohibits the government's conversion of an individual's private property, as opposed to the mere technical trespass to an individual's private property. *See, e.g.*, *United States v. Karo*, 468 U.S. 705, 712–13, 104 S. Ct. 3296, 82 L. Ed. 2d 530 (1984) (explaining the existence of a mere technical physical trespass to an individual's property "is only marginally relevant to the question of whether the Fourth Amendment has been violated," as "[a] 'seizure' of property occurs when 'there is some meaningful interference with an individual's possessory interests in that property'") (quoting *Jacobsen*, 466 U.S. at 113, 104 S. Ct. 1652); *Jacobsen*, 466 U.S. at 124–25, 104 S. Ct. 1652 (stating "the field test [of the white substance] did affect respondents' possessory interests protected by the [Fourth] Amendment, since by destroying a quantity of the powder it converted what had been only a temporary deprivation of possessory interests into a permanent one"); W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 15 at 92, 102 (5th ed.1984) (recognizing the tort of conversion differs from the tort of trespass in that conversion requires "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the [owner]'s rights," and noting "[t]he gist of conversion is the interference with control of the [owner's] property"). Because we do not believe *Jacobsen* enunciated separate standards for seizure cases, we will not concern ourselves with trying to apply "both" standards. Instead, we will focus on whether the

NSP's conduct constituted some meaningful interference with Va Lerie's possessory interests in his checked luggage.

424 F.3d at 701–03 (alterations in original).

Although it is not shown on any body camera video, law enforcement's taking samples of the gasoline, wicks, and bottles found in the bathroom constituted a seizure. *Id.* at 702. The seizure was reasonable.

I respectfully disagree with Defendant that this seizure violated his Fourth Amendment rights. (Doc. 50-1 at 7.) I have already determined that Mr. Richards Sr.'s entry into the home was foreseeable and that he had the apparent authority to invite officers into Defendant's home. Once inside, Lt. Wibe and Officer Kaczinski's search stayed within the limits of the Richards's private search and was therefore constitutional. *See Jacobsen*, 466 U.S. at 120-21; *Miller*, 152 F.3d at 815. Lt. Wibe did not enter the bathroom to determine the nature of the items under the sink, just like the Richards did during their private search.

I further find that the seizure of the contraband found in the bathroom was constitutional for two reasons. First, as discussed above, *Rouse* and its progeny did not address whether the airline employee touched or manipulated the contraband cards in anyway prior to calling law enforcement. 148 F.3d at 1041; *Kinney*, 953 F.2d at 864, 866 (no evidence that private citizen touched firearms, only that she saw them before calling police). Thus, as discussed above, physical contact is not the issue. It is safe to assume that law enforcement in *Rouse* seized the contraband cards just as the HDU officers seized the contraband in this case. Seizing contraband that a legal search has revealed is not an illegal seizure. This leads me to the second reason the seizure of the contraband was constitutional.

From his legal vantage point at the bathroom doorway, Lt. Wibe could see the contraband in plain view under the bathroom sink and the illegal nature of the gasoline,

35

Corona bottles filled with gasoline, and fabric wicks was immediately apparent to him. The plain view doctrine "permits an officer to 'seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating nature is immediately apparent, and the officer has a lawful right of access to the object.'" *United States v. Hastings*, 685 F.3d 724, 729 (8th Cir. 2012) (quoting *United States v. Darr*, 661 F.3d 375, 379 (8th Cir. 2011) (quoting *United States v. Bustos–Torres*, 396 F.3d 935, 944 (8th Cir. 2005)). "'Plain view' is perhaps better understood, therefore, not as an independent 'exception' to the warrant clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." *PPS, Inc. v. Faulkner Cnty., Ark.*, 630 F.3d 1098, 1103 (8th Cir. 2011) (citing *Texas v. Brown,* 460 U.S. 730, 738-39 (1983) (plurality opinion)). Moreover, "[w]here the elements of the plain view doctrine are met, the fact that the officers could have left and obtained a warrant does not invalidate the justification for seizing the property." *Id.* at 1106.

Here, Lt. Wibe was legally in the bathroom doorway because that was as far as the Richards went with their private search. *See Miller*, 152 F.3d at 816 (holding the police intrusion went no further than the employees' intrusion, which had been conducted in a private capacity, and therefore "no Fourth Amendment search occurred at all, so the drug evidence in [the] case was lawfully obtained."). The smell of gasoline and the qualities of the completed Molotov cocktails made it obvious to Lt. Wibe that the objects under the sink were incendiary devices. He immediately called for the HDU team.

Under Iowa law, "[a]n 'incendiary device' is a device, contrivance, or material causing or designed to cause destruction of property by fire." Iowa Code § 702.21. "A person who possesses any incendiary or explosive device or material with the intent to use such device or material to commit a public offense shall be guilty of a class 'C' felony. . . . A person who possesses any incendiary or explosive device or material shall

36

be guilty of an aggravated misdemeanor." *Id.* §§ 712.6(1), (2)(a). In addition, "[a]ny person who threatens to place or attempts to place any incendiary or explosive device or material, or any destructive substance or device in any place where it will endanger persons or property, commits a class 'D' felony." *Id.* § 712.8. Because even possessing such devices is illegal under Iowa law, officers had the lawful right to access the objects themselves. Here, Defendant not only possessed incendiary devices, he had threatened to use them against himself and others. That Defendant thinks Lt. Wibe should have sought a warrant before calling the HDU team to seize the contraband does not change the fact that the seizure was constitutional. *PPS, Inc.*, 630 F.3d at 1106.

Accordingly, no search occurred because officers did not exceed the scope of the Richards's private search when they saw the contraband in the bathroom in plain view. Once they saw the contraband in plain view, HDU officers were legally allowed to seize the items.

### 2.     Conclusion

I find that the items seized from the bathroom were seized legally and should not be suppressed.

### C.     Whether Contraband Seized from the Kitchen Should be Suppressed

The parties agree that officers' search of Defendant's home beyond the bathroom exceeded the private-party search conducted by the Richards. For purposes of this motion, only officers' search of the kitchen is at issue. In the kitchen, officers found a fourth Molotov cocktail in plain view on the floor and the items made from putty and nails inside the oven.[13]

---

[13] Although these items do not appear to form the basis of any of the charges against Defendant in this Court and were not seized on May 19, 2021, Defendant seeks suppression of "nails." (Doc. 50 at 1.)

The Government argues that the search of the kitchen was justified on one or more of three bases: (1) as a plain view search that was within the scope of the private search; (2) as a cursory search authorized by the consent given by Mr. Richards Sr., whom officers reasonably believed had the authority to grant permission to search; and/or (3) as a warrantless probable cause search based on exigent circumstances. Defendant responds that none of those reasons can justify the search of the kitchen.

### 1. Whether the Richards' Plain View Search Justified CRPD's Plain View Search of the Kitchen

The Government asserts that because Mr. Richard Sr.'s private search was a plain view search and "[t]he fourth explosive device was found in the kitchen in plain view. [Therefore,] [t]he plain view search for explosive materials . . . was within the scope of the private search." (Doc. 54-1 at 9.) The Government's argument is contrary to the case law requiring law enforcement's search not exceed the private search by accessing evidence that the Richards did not tell them about or that the evidence be in plain view while officers are in the same place as the Richards were when they saw the contraband. *See Bowman*, 215 F.3d at 963 (law enforcement exceeded search by owner of storage locker by viewing parts of video tapes owner of locker did not view); *Rouse*, 148 F.3d at 1041 (evidence not in plain view in luggage that was not brought to law enforcement's attention by private party suppressed). Accordingly, the warrantless search of the kitchen cannot be justified on this basis because the Richards did not tell law enforcement there was contraband in the kitchen. In fact, the Richards told Lt. Wibe and Officer Kaczinski that they went, at the farthest, into the bathroom, before they called 911:

Officer Kaczinski: Have you been throughout the whole house?
Mr. Richards Sr.: No. We went as far as—He told me he had gasoline and materials, so—

(Def. Ex. D at 1:46:24 p.m.) The Richards' plain view search did not justify CRPD's plain view search of the kitchen.

38

2.     *Whether Mr. Richards Sr.'s Apparent Authority to Grant the CRPD Access to Defendant's Home Justified CRPD's Plain View Search of the Kitchen*

When making an apparent authority determination, "[t]he critical facts . . . are not the actual relationship between the consenter and owner, but how that relationship appears to the officer who asked for consent." *Weston*, 443 F.3d at 668 (ellipses in original) (quoting *Pennington*, 287 F.3d at 746–47). For all of the reasons discussed in parts III.B.b and III.B.c.i, *supa*, Mr. Richards Sr. had the apparent authority to grant the CRPD access to Defendant's home. Mr. Richards Sr. stated he had an ownership interest in the home and wanted to protect not only his mentally-ill son, but also his son's home. I further find that Mr. Richards Sr. also had the apparent authority to grant the CRPD access to the kitchen and not only to the limited area that he and Mr. Richards Jr. searched. On body camera video, Mr. Richards Sr. seems comfortable with officers accessing the kitchen while he is in the home and he and Mr. Richards Jr. discussed with Lt. Wibe and other officers their hope that this contact with law enforcement would lead to Defendant getting access to the mental health resources that he needed. (Def. Ex. D at 2:05:30-2:08:51 p.m.) Mr. Richards Jr. stated that Defendant's behavior had become "more than just a mental health issue." It had become "a public health issue." (*Id.* at 2:07:47 p.m.) Based on these facts, I find that Mr. Richards Sr. had apparent authority to grant the CRPD access to Defendant's kitchen. Therefore, because Officer Kaczinski was legally in the kitchen when he saw the fourth Molotov cocktail in plain view, the seizure of that evidence was legal. *See Hastings*, 685 F.3d at 729.

3.     *Whether Exigent Circumstances Justified CRPD's Plain View Search of the Kitchen*

As stated above, "[t]he exigent circumstances exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *Ramirez*, 676 F.3d at 759.

39

I find that although exigent circumstances justified officers' initial entry into Defendant's home, exigent circumstances did not justify the plain view search of the kitchen. Any exigency presented by the possibility that Defendant could have arrived home and escalated the situation, was no longer present once officers on scene were notified that Defendant was taken into custody at approximately 2:00 p.m. (*Id.* at 1:59:46 p.m.). In addition, the only place that appeared to be a source of a gasoline smell was the bathroom. (*Id.* at 1:56:26 p.m.) Even then, officers on scene did not appear concerned that the amount of gasoline was a danger to people inside the home and Lt. Wibe testified that he did not feel people were in any danger as long as they were not in the bathroom. If gasoline cans and empty beer bottles, alone, constituted exigent circumstances to bypass warrant requirements, law enforcement could conduct warrantless searches of most garages in Cedar Rapids. Therefore, I find the situation no longer presented an exigent danger to people's lives or to evidence. *See Ramirez*, 676 F.3d at 759. Exigent circumstances did not justify CRPD's plain view search of the kitchen.

### 4.    *Conclusion*

Because Mr. Richards Sr. maintained apparent authority at all times to allow the CRPD to access all areas of Defendant's home, I find that the items seized from the kitchen were legally seized and should not be suppressed.[14]

---

[14] Defendant argues that the community caretaking exception to the warrant requirement could not justify the warrantless search of his home. (Doc. 50-1 at 11.) The Government agrees that the community caretaking exception does not apply to this case because the exception does not apply to private homes. (Doc. 54-1 at 14 n.5 (citing *Caniglia v. Strom,* --- U.S. ---, 141 S. Ct. 1596, 1600 (2021)).) I agree with the parties that the community caretaking exception does not apply in this case.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **DENY** Defendant's Motion to Suppress. **(Doc. 50.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 21st day of April, 2022.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

41