# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 21-CR-69-CJW-MAR |
| vs. | **ORDER** |
| MELCHIZEDEK ROBIN HAYES, | |
| Defendant. | |

## I.     INTRODUCTION

This matter is before the Court on the parties' objections (Docs. 58, 61) to the Report and Recommendation ("R&R") of the Honorable Mark A. Roberts, United States Magistrate Judge, recommending that the Court deny defendant's Motion to Suppress Evidence. (Doc. 56).

On March 2, 2022, defendant filed a Motion to Suppress. (Doc. 50). The government timely resisted the motion. (Doc. 54). On March 31, 2022, Judge Roberts held a hearing on the motion (Doc. 55) and on April 21, 2022, he issued his R&R, recommending that the Court deny defendant's motion (Doc. 56). On April 27, 2022, the government timely filed its objections to the R&R, (Doc. 58), and on May 5, 2022, defendant timely filed his objections. (Doc. 61).

For the following reasons, the Court **overrules** defendant's objections, sustains the government's objections, **adopts** Judge Roberts' R&R, and **denies** defendant's Motion to Suppress.

1

## II.     STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id*. If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'"

2

*United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district courts required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity of . . . retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has concluded that general objections require "full *de novo* review" if the record is concise. *Id*. Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with

"clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation when the district court "is left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: A district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus,

although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### III. FACTUAL BACKGROUND

Judge Roberts made numerous factual findings based on the evidence presented during the suppression hearing. Neither party has objected to these findings, so the Court reviews them for clear error. The Court finds no error in the recitation of facts contained in the R&R and adopts them without modification. These facts are as follows:

> Beginning in December 2020, Michael L. Richards ("Mr. Richards Sr.") and his wife Lynette ("Ms. Richards") (collectively "Defendant's parents") had concerns about Defendant's declining mental health. (Gov. Ex. 4 at 6). Mr. Richards Sr. and Ms. Richards are Defendant's parents. (*Id.* at 4). Defendant had become paranoid, thought people were following him, began missing work, engaged in criminal behavior, and at one point, led police on a high-speed chase as he tried to outrun his perceived pursuers that resulted in him crashing his car. (*Id.* at 5-8). He eventually lost his job. (*Id.* at 6). In April 2021, Defendants' parents filed mental health commitment papers regarding Defendant because he expressed suicidal intent since his career was gone, his car was gone, and "his life was in shambles." (*Id.* at 7-8). However, Defendant was released from one mental health facility after a few days and walked away from another one before he ever received treatment. (*Id.* at 9-10). On May 18 and 19, 2021, Defendant stated that he had made his peace with God and "basically it was, 'I may as well just blow myself up.'" (*Id.* at 8).
>
> On May 19, 2021, Mr. Richards Sr. noticed that the door to Defendant's house was open, which was unusual. Mr. Richards Sr. knew Defendant was not at home because he saw him leave with Ms. Richards to go to the driver's license station. (Richards Hr'g Test). Defendant lives directly across the street from his parents on the southeast side of Cedar Rapids and usually keeps his house locked because he has expensive computer and electronic music equipment. (*Id.* at 8-9). This concerned Mr. Richards Sr. because of Defendant's recent suicide threats. Mr. Richards Sr. does not have a key to Defendant's house, but entered the house through the open door to conduct "what's commonly referred to as a welfare check." (*Id.* at 9). Michael A. Richards ("Mr. Richards Jr."),

5

Defendant's brother, entered Defendant's house with Mr. Richards Sr. (Richards Hr'g Test). They found Molotov cocktails under the sink in Defendant's bathroom. (Def. Ex. D at 1:43:37 p.m.) .

Mr. Richards Sr. called 911 and explained that his son, the occupant of the home and Defendant in this case, was committed by a judge due to mental health issues for being a danger to himself and others, was released after five days, had "deteriorated seriously," and now had all the materials—gasoline, bottles, and rags—for making Molotov cocktails and was "getting ready to take action." (Gov. Ex. 1 at :30-:59). Mr. Richards Sr. said he was in the house because his family owned the house and that Defendant was currently walking home from the Department of Transportation on the southwest side of town. (*Id.*).

When officers arrived on the scene, they encountered Mr. Richards Sr. who appeared to lead them directly into the home. I note that there appears to be little or no discussion about the authority Mr. Richards Sr. might have to enter the home before they follow him in. At the very beginning of Lt. Wibe's body camera video, Mr. Richards Sr. can be heard (with some difficulty) stating, "Our family lives across the road." (Gov. Ex. 3 at 1:43:10). Lt. Dominic Wibe of the Cedar Rapids Police Department ("CRPD") was the first officer to enter the house with Mr. Richards Sr. CRPD Officer Kaczinksi arrived separately and entered the house at about the same time. At 1:43:28 p.m., Mr. Richards Sr. entered the house before Lt. Wibe and led the officers into the house. (Def. Ex. D at 1:43:28 p.m.). Once inside the house, Mr. Richards Sr. stopped in the living room where Mr. Richards Jr. was waiting. The following conversation took place beginning at 1:43:35 p.m.

| | |
|---|---|
| Mr. Richards Sr.: | So, his exact words are, "I've made peace with God. I'm taking myself out and everyone around me." |
| Mr. Richards Jr: | And he's previously threatened to kill all the family. He's making Molotov cocktails in there. You can see for yourself. [Points toward bathroom.] |
| Lt. Wibe: | Okay. |
| Mr. Richards Sr.: | Right there. [Points toward bathroom.] There's a full gallon of gas and bottles and knives and things—[Lt. Wibe's Body camera shows Lt. Wibe moving toward the bathroom door.] |
| Officer Kaczinski: | Do you know, would he have a phone or anything like that? |

6

Mr. Richards Sr.:   [Inaudible response.]

[At 1:43:57 p.m., Lt. Wibe appears to take a step toward what he later described at the hearing as "a secondary hallway;" but does not go through the open doorway of the bathroom; get close to the gasoline, bottles, or rags; and makes no attempt to touch or disrupt the items. He takes photographs of the contraband with his cell phone beginning at 1:44:27 p.m. During this time, Mr. Richards Sr. speaks to Officer Kaczinski, but the conversation is covered up by conversations on Lt. Wibe's police radio. Lt. Wibe exits the area at 1:44:34 p.m. and sends the photos from his phone. Lt. Wibe smelled gasoline. (Wibe Hr'g Test). Lt. Wibe testified that he was standing in the doorway when he photographed the items and sent the photos to the Hazardous Device Unit ("HDU").]

| | |
|---|---|
| Lt. Wibe: | So how do we have access to this place? |
| Officer Kaczinski: | That's what I was trying to clarify before we walked in— |
| Mr. Richards Sr.: | You can look it up on the Secretary of State. Our family business is Prometheus Incorporated and we hold real estate. |

(Def. Ex. D at 1:45:00-14 p.m.).

[As Mr. Richards Sr. was explaining the above, Lt. Wibe took a phone call and explained that he was at a residence and had 12 Corona bottles filled with gasoline, 3 or 4 of which had wicks. (*Id.* at 1:45:20-25 p.m.). The HDU officer said that he would come to the house. When Lt. Wibe finished his phone conversation, he continued the conversation with Mr. Richards Sr.:]

| | |
|---|---|
| Officer Kaczinski: | We just have gotta make sure that we're in here legally— |
| Lt. Wibe: | So do you rent this to him, then, or? |
| Mr. Richards Sr.: | Right now he's unemployed— |
| Lt. Wibe: | Yeah. |
| Mr. Richards Sr.: | So we're letting him stay here. |
| Lt. Wibe: | So, you're allowing him to stay here, but it's your lease property— |
| Mr. Richards Sr.: | Yeah, we own the property. |

7

| | |
|---|---|
| Lt. Wibe: | So you came in for a [sic] inspection or— |
| Mr. Richards Sr.: | Yes— |
| Mr. Richards Jr.: | No. He mentioned that he was gonna burn down this house and their house [pointing toward Mr. Richards Sr.] and kill as many family members as he can. And that's why we came in here. And we, we just found the Molotov cocktails— |
| Mr. Richards Sr.: | And the door was unlocked—But, uh— |
| Lt. Wibe: | Okay. So you were doing a safety inspection. |
| Mr. Richards Jr.: | Yeah. |
| Mr. Richards Sr.: | Absolutely. |
| Lt. Wibe: | We just have to clarify that. After he's threatened to burn it down, you knew he was gone, you did a safety inspection— |
| Officer Kaczinski: | Have you been throughout the whole house? |
| Mr. Richards Sr.: | No. No. No. We went as far as—He told me he had gasoline and materials, so— |
| Lt. Wibe: | Okay. |

(Def. Ex. D at 1:45:25-1:46:25 p.m.) (emphasis added).

At this point, 1:46:27 p.m., Lt. Wibe left the house to make a phone call and take photographs of the exterior of the house. Lt. Wibe went back into the house at 1:50:23 p.m. and conducted a plain view search of Defendant's office from the doorway to the office, which is between the entrance to the house and the bathroom. (Def. Ex. D at 1:50:51-1:51:05). He also tried to confirm with someone on his radio that Defendant had an open committal and the person he spoke with believed Defendant did. (*Id.* at 1:51:37- 1:52:08 p.m.). While speaking on the radio, Lt. Wibe conducted a plain view search both of the secondary hallway outside of the bathroom and inside the bathroom. (*Id.* at 1:51:36-1:51:50 p.m.).

Two HDU fire officers arrived at approximately 1:54 p.m. and Lt. Wibe met them outside the house and explained that Defendant threatened to burn down the house and the "landlord's" house across the street, which is Mr. Richards Sr.'s house, and that Mr. Richards Sr. and Mr. Richards Jr. (collectively, "the Richards") went into the house to do a welfare check. (*Id.* at 1:54:38-42). One of the HDU officers stated they were on good legal ground (presumably regarding entering and seizing evidence) with the threats and the incendiary devices and that he "could even make the case

8

for a federal charge here." (*Id.* at 1:55:00-08 p.m.). Lt. Wibe told someone named "Dale" on his radio at 1:55:17 p.m. that the "fire guys" were "positive they wanted to pursue charges for this." Dale responded that they would take Defendant into custody. (*Id.* at 1:55:31 p.m.).

Lt. Wibe then entered the bathroom at 1:55:55 p.m. to photograph the gasoline, bottles, and rags with a camera. One of the HDU officers entered the bathroom at 1:56:18 p.m. to begin processing the evidence for seizure. Defendant was taken into custody at approximately 1:56 p.m. as he was walking on a public sidewalk. (Def. Ex. C at 1:56:30 p.m.). Within minutes, Lt. Wibe was notified that Defendant had been arrested. (Def. Ex. D at 1:59:46 p.m.).

While officers were processing evidence in the bathroom, the Richards explained to officers that Defendant's mental health had deteriorated precipitously in the previous three months, that he lost a good job, became paranoid, and began threatening the family. It appears that Mr. Richards Sr. stayed in Defendant's house approximately 45 minutes. (*Id.* at 2:22:45 p.m.) (video showing Mr. Richards Sr. leaving house in background of officers' conversation).

At 2:23 p.m., Officer Kaczinski found a fourth Molotov cocktail in the kitchen made from a glass olive oil bottle. (Def. Ex. A at 2:23:02 p.m.). This cocktail was also seized. (Doc. 18-2 at 4). All four devices were determined to be explosive devices by the Bureau of Alcohol, Tobacco, and Firearms. (*Id.*). Officers also found a tray in the oven that contained nails baked into putty. (Def. Ex. D. at 2:14:56-2:15:35 p.m.). Officer Wibe wondered if the items were "something that would blow up" or "a homemade throwing star or something." (Id. at 2:16:57-2:17:02 p.m.). These items were not seized. (Doc. 54-1 at 4).

Lt. Wibe testified that he believed Mr. Richards Sr. had the authority to allow officers to search the home because he is Defendant's father and, as a father himself, Lt. Wibe would want the authority to allow a search if he was concerned about his child's mental health, the child had made threats, and he had found hazardous devices in his child's home. Lt. Wibe also felt that Mr. Richards Sr. had the authority to allow officers to search the home because his family's company owned the property, and as a property owner who saw an open door and was dealing with someone who said they were going to burn down the building, he thought Mr. Richards Sr. had "exigent circumstances, if you will," to enter the home based on an emergency "without notice on the lease." Lt. Wibe never asked Mr. Richards Sr. if he had Defendant's permission to enter the home or if he

9

> had a key to the home. Those two factors led Lt. Wibe to believe he had "more than enough ample authority, because it's his property and his son and he allowed us to come in, invited us in, and showed us the devices." Lt. Wibe also testified that he considered getting a search warrant, but did not feel it was necessary.

(Doc. 56, 4–11) (footnotes omitted).

The Court will add additional facts as needed in its analysis of the R&R.

## IV. ANALYSIS

### A. *Defendant's Objections*

Defendant initially argued that CRPD officers' entry into his home violated the Fourth Amendment because they did not obtain a warrant and no recognized exception to the warrant requirement applied under these facts. (Doc. 50-1, at 6–7). Defendant specifically argued that (1) the private search exception did not apply because it was not reasonably foreseeable that Richards, Sr., would enter the home, (2) no exigency existed to justify the search, (3), defendant did not consent to the search and (4) the facts do not support application of the community caretaking exception. (*Id.*, 6–11).

Finding that the Richards did not act at the behest of the CRPD, that it was reasonably foreseeable that Richards Sr. would enter the home, and that CRPD officers did not exceed the scope of Richards Sr.'s search, Judge Roberts concluded that the private search exception applied here. (Doc. 56, at 14–19, 28–37). Once lawfully in a position to observe the contraband in defendant's bathroom, Judge Roberts found that the seizure of the contraband was justified under the plain view doctrine. (*Id.*, at 35–37). Judge Roberts also found that the Richards possessed apparent authority to consent to a search of the premises and that the circumstances confronting the CRPD officers were sufficiently exigent to permit a "limited entry into the home." (*Id.*, at 19–28).

Defendant objects to these findings and argues that (1) the private search exception does not apply because the Richards' entry into his home was not foreseeable and CRPD

10

officers exceeded the scope of the private search, (2) the Richards did not have apparent authority to consent to a search, (3) no exigency existed to justify the initial entry into the home, (4) that the CRPD officers' entry exceeded the scope of the initial search, and (5) the plain view doctrine does not justify the seizure of contraband from the bathroom. (Doc. 61).

### 1. *Private Search Exception*

It is well settled that the Fourth Amendment constrains only government action. *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). Searches conducted by private individuals, even those conducted wrongfully or unlawfully, do not implicate the Fourth Amendment. *Walter v. United States*, 447 U.CS. 649, 656 (1980) (citing *Burdeau*, 256 U.S. at 475). A search conducted by a private individual who is not bound by the Fourth Amendment frustrates a person's expectation of privacy to some degree and justifies an identical warrantless search by law enforcement. *United States v. Jacobsen*, 466 U.S. 109, 117 (1984). For this exception to apply, the private individual conducting the search must not be acting on behalf of law enforcement and the subsequent search by law enforcement may not exceed the scope of the initial private search. *United States v. Miller*, 152 F.3d 813, 815 (8th Cir. 1998) (citing *Jacobsen*, 466 U.S. at 113, 120).

Defendant relies heavily on the Fifth Circuit Court of Appeals holding in *United States v. Paige*, 136 F.3d 1012 (5th Cir. 1998), which established a third requirement for the private search exception to apply: that the private search be reasonably foreseeable. (Doc. 56, at 1–7). In his concurrence in *Miller*, Judge Murphy opined that he would have adopted the foreseeability requirement as described in *Paige*. 152 F.3d at 816. Citing this, defendant argues that "[n]othing in *Miller* suggests that the Eighth Circuit disagrees with the Fifth Circuit's foreseeability analysis in *Paige* when the police follow a private search with their own search." (Doc. 61, at 2 n.2). Defendant's reliance on *Paige* and the concurring opinion in *Miller* is misplaced.

11

Far from adopting foreseeability as a requirement, the majority in *Miller* expressly left open the question of whether foreseeability should be a requirement of the private search exception. 152 F.3d at 816 ("We neither adopt nor reject the Fifth Circuit's rule because the police search in this case would pass muster under . . . *Paige*."). Defendant urges the Court—at least by implication—to adopt this foreseeability requirement because the Eighth Circuit has not expressly disclaimed it and because one judge once expressed support for it in concurrence. Subsequent decisions by the Eighth Circuit, however, offer some insight as to how much weight the *Paige* opinion carries. *See, e.g.*, *United States v. Goodale*, 738 F.3d 917, 921 (8th Cir. 2013); *United States v. Starr*, 533 F.3d 985 (8th Cir. 2008); *United States v. Muhlenbruch*, 634 F.3d 987 (8th Cir. 2011); *United States v. Johnson*, 505 Fed. App'x 606 (8th Cir. 2013); *United States v. Sigillito*, 759 F.3d 913 (8th Cir. 2014); *United States v. Suellentrop*, 953 F.3d 1047 (8th Cir. 2020); *United States v. Ringland*, 966 F.3d 731 (8th Cir. 2020). Each of these opinions consider the issue of a private search based on the analytical framework described in *Miller*. None of these opinions make even a passing mention of a foreseeability requirement. In fact, no panel of the Eighth Circuit since *Miller* has even mentioned *Paige* in the context of the private search exception. In *Miller*, the Eighth Circuit left open the possibility of adopting the foreseeability standard at some future time. That possibility remains open, but foreseeability is not now—nor has it ever been—a requirement of the private search exception in the Eighth Circuit. Defendant's objection on this ground is **overruled.**

### 2. *Apparent Authority*

Warrantless searches are presumptively unreasonable. One exception to this rule is when a search is performed with the consent of "a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Authority to consent to a search is established "when an officer reasonably relies on a third party's

12

demonstration of apparent authority, even if that party lacks common authority." *United States v. Amratiel*, 622 F.3d 914, 916 (8th Cir. 2010). A third party possesses apparent authority when "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party ha[s] authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (internal quotations omitted). Equally important to the disposition of the instant case as what the Fourth Amendment does protect is what it does not protect. Crucially, "the Fourth Amendment does not assure a defendant no government search of his house will occur unless he consents, rather the Fourth Amendment guarantees only no such search will occur that is unreasonable." *United States v. Hudspeth*, 518 F.3d 954, 959 (8th Cir. 2008).

Judge Roberts found that police properly relied on the apparent authority of Richards Sr. to consent to the search of defendant's home. (Doc. 56, at 19–24). Defendant argues that the facts available to law enforcement officers were insufficient to establish apparent authority. (Doc. 61, at 7–11). Defendant's objection is rooted firmly in strict legal relationships and the actual authority imputed by those relationships. Such distinctions, while not entirely irrelevant, are not especially helpful in determining whether officers acted reasonably given the facts they had available to them.

The Court agrees with Judge Roberts' conclusion. Richards Sr. represented to the officers at the scene that he owned the home, through the family company. He also represented to the officers that defendant was his son and that the rest of the family lived across the street. He possessed significant information about defendant's mental health and his personal concerns for defendant's safety and the safety of his family. Further, Richards Sr. informed the officers that he had signed commitment papers for defendant based on defendant's mental health conditions. Taken together, these facts paint a picture of Richards Sr. as something more than mere landlord—and even more than a concerned parent of an adult child. Given defendant's mental unrest and the seemingly above

13

average involvement of Richards Sr. in defendant's affairs, Richards Sr. appeared to occupy a nearly custodial role in defendant's life. Far from relying on a "concerned father exception" as alleged by defendant, the totality of the circumstances renders the CRPD officers' reliance on his apparent authority eminently reasonable.

The Court has already found that CRPD officers were entitled to enter defendant's home under the private search exception. Thus, no consent was necessary. The Court nevertheless finds that the facts available to the officers established a reasonable basis for them to conclude that Richards Sr. possessed the authority to consent to a search of defendant's home. Defendant's objection on this ground is **overruled**.

### *3. Exigency*

Law enforcement officers may conduct a warrantless search of a person's home unless otherwise justified by exigent circumstances. *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996) (citing *Payton v. New York*, 445 U.S. 573, 589 (1980)). The circumstances of a given case are considered exigent when the officers have probable cause to believe that "lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *Id.* (citations omitted). *See also Kleinholz v. United States*, 339 F.3d 674, 677 (8th Cir. 2003) ("[A] search warrant is legal when justified by both probable cause and exigent circumstances.").

In his initial motion to suppress, defendant did not clearly articulate specifically what police action he believed was not justified by exigent circumstances, be it a search or a seizure. Defendant argued that the government burden to show exigent circumstances "[t]o the extent that exigent circumstances might justify a warrantless search," but asserted broadly that no exigent circumstances were present because "there was ample time for police to secure a warrant and [there was] no imminent risk that evidence would be destroyed." (Doc. 50-1, at 7–8). Judge Roberts found that the 911 call from Richards Sr. established probable cause to believe that evidence of a crime—

14

namely, hazardous devices and their components—would be located inside defendant's home. (Doc. 56, at 26). Judge Roberts also found that the dangerous nature of the materials involved created the exigency required to affect a warrantless entry. (*Id.*). Judge Roberts concluded that "[t]he only way to assess and eliminate any danger to the home and the surrounding property was to make a limited entry into the home." (*Id.*). Thus, Judge Roberts did not discuss the seizure of the evidence in the context of the exigent circumstances exception. Defendant now objects and argues that exigent circumstances did not justify either the initial entry or the seizure of the evidence. (Doc. 61, at 11–14). Defendant's "arguments have no merit and require little discussion." *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996).

The Court finds that CRPD officers had probable cause to believe that evidence of a crime was located within defendant's home and that the circumstances facing the officers were sufficiently exigent to justify a warrantless entry into the home.[1] Richards Sr. had characterized the devices as Molotov cocktails, a fact which defendant seems to view as something of a mitigating factor. After all, every homeowner has "a variety of flammable products on their premises." (Doc. 61, at 13). This argument is unrealistic and "relies too heavily on hindsight." *Ball*, 90 F.3d at 263. The Court "must view the facts from the standpoint of officers at the scene." *Id.* From this vantage point, it is clear that police were facing quite a bit more than "a few bottles of gasoline" that day. (Doc. 61, at 12). Based on the eyewitness accounts of Richards Sr. and Richards Jr., law enforcement officers were facing the creations of a mentally unstable and violent man who had threatened to not only harm himself, but also his family and others. Law

---

[1] Because Judge Roberts did not make a finding regarding the *seizure* of evidence in the context of the exigent circumstances exception, defendant's objection to this issue specifically is misplaced. Judge Roberts analyzed the seizure under the plain view exception, which the Court addresses below.

enforcement officers knew that there were incendiary devices inside the home, specifically in the bathroom, but had no way of knowing what else may be located within.

Further, as cooperative as Richards Sr. was, he is not an expert in explosives or hazardous devices. Law enforcement officers were not obliged to accept his assessment of the devices as Molotov cocktails at face value. A cursory search of the internet could reveal myriad relatively simple initiation mechanisms that are far more dangerous than the simple rag and lighter implied by the term Molotov cocktail. In the context of defendant's mental instability, his threatening language, and the observation of some type of hazardous device inside his home, police were entitled, indeed obligated for purposes of public safety, to investigate further to ensure that there was no larger risk to the home or neighboring properties.

With the benefit of hindsight, defendant coolly implies that law enforcement officer's concerns over "a few bottles of gasoline" was overblown. The Court disagrees. Considering the totality circumstances—not just the details that defendant chooses to emphasize—law enforcement officers were entirely justified in entering the home. Defendant's motion on this ground is **overruled**.

### 4. *Scope of the Search*

Judge Roberts found that officers did not exceed the scope of the private search conducted by Richards Sr., and thus, no Fourth Amendment violation occurred. (Doc. 56, at 33–37). Defendant objects to this conclusion. (Doc. 61, at 14–17). To be precise, defendant "objects to the legal conclusion that the seizure of the defendant's property did not exceed the scope of [Richards Sr.'s] initial search." (*Id.*, at 14).

The resolution to this objection lies in the framing of the objection itself. Judge Roberts acknowledges—and no party disputes—that law enforcement officers exceeded the scope of the initial private *search* when they *seized* the evidence. Judge Roberts does not attempt to justify the seizure of the evidence by relying on the private search doctrine.

16

Judge Roberts is quite clear that the law enforcement officers were entitled to proceed into defendant's home no further than Richards Sr. entered, and from that vantage point observed contraband in plain view that provided independent justification for the seizure. (Doc. 56, 35–36). In short, defendant objects to a conclusion that Judge Roberts does not reach. Defendant's objection on this ground is **overruled**.

### 5. *Evidence in Plain View*

Defendant also objects to Judge Roberts' conclusion that the seizure of the evidence was justified under the plain view doctrine. (Doc. 61, at 17–18). Defendant spends little time arguing the point, however, simply—and implausibly—asserting that "[w]hether the illegality of beer bottles that might be filled with gasoline was apparent is at least debatable." (*Id.*, at 17). "[T]he larger issue," according to defendant, is that law enforcement officers had no lawful right to be in the position to observe the contraband in the first place. (*Id.*, at 18). Defendant's objection fails on both points.

The plain view doctrine "permits an officer to seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating nature is immediately apparent, and the officer has a lawful right of access to the object." *United States v. Hastings*, 685 F.3d 724, 729 (8th Cir. 2012) (cleaned up). The Court has already found that the private search exception applies here. CRPD officers proceeded no further than allowed under that exception when they observed, in plain view, multiple glass bottles filled with a liquid which the officers assumed to be gasoline. Given the smell of gasoline in the air, the red gasoline container immediately next to the bottles, and the presence of fabric wicks next to the bottles—taken together with the threats previously made by defendant—the Court finds that the incriminating nature of the seized items was immediately apparent. Thus, the warrantless seizure of this evidence did not violate the Fourth Amendment. Defendant's objection on this ground is **overruled**.

17

### B. Government's Objection

Judge Roberts found that the exigency presented by the hazardous devices discovered in the bathroom did not extend anywhere else in defendant's home and that the warrantless plain view search of defendant's kitchen violated the Fourth Amendment. (Doc. 56, at 39–40). The government objects to this conclusion and argues that the risk posed by undiscovered devices presented a sufficient exigency to justify a cursory search of other areas of the home. (Doc. 58). The Court agrees.

The same rationale that supported the existence of exigent circumstances justifying a search of the bathroom obtain for the rest of the home as well. True, defendant was not—and, given that he had been arrested, could not be—present to escalate the situation or ignite any of the devices himself. The great potential for violence represented by defendant's mental instability and threats against his family and others, the extreme nature of the devices known to be present in the home, and the uniquely destructive potential of undiscovered explosive devices justified further investigation into the home. CRPD officers were not obliged to assume any other potential devices would be rudimentary or inert. A cursory visual inspection of the kitchen was therefore justified under the circumstances. The government's motion on this ground is **sustained**.

### V. CONCLUSION

For the reasons stated above, defendant's objections (Doc. 61) are **overruled** and the government's objections (Doc. 58) are **sustained**. The Court **adopts** Judge Roberts' R&R (Doc. 56) and **denies** defendant's Motion to Suppress (Doc. 50).

**IT IS SO ORDERED** this 2nd day of June, 2022.

_____
C.J. Williams
United States District Judge
Northern District of Iowa